**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:17-cr-00029-TLS-SLC** |
| | ) | |
| **JOSEPH E. SANDERS** | ) | |

## REPORT AND RECOMMENDATION

Before the Court is a motion to suppress evidence (DE 30) and a supplemental motion to

suppress evidence (DE 47) filed by Defendant Joseph Sanders. Sanders seeks to suppress

evidence discovered by police officers after a traffic incident on March 21, 2017, and evidence

discovered when Sanders was arrested at a residence on Buell Drive, on May 2, 2017. Sanders

contends that all of the evidence from both encounters was obtained as a result of violations of

his Fourth Amendment rights and his rights under the Due Process Clause of the Fourteenth

Amendment. After considering the evidence and argument submitted by the parties in this

matter, I RECOMMEND that Sanders's motion to suppress evidence and supplemental motion

to suppress evidence be DENIED.

## I. BACKGROUND

On April 26, 2017, Sanders was indicted by way of a single-count indictment and

charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (DE

1). An arrest warrant was issued (DE 4), and Sanders was arrested on May 2, 2017 (DE 5).

Following his arrest, Sanders was indicted by way of a four-count superseding indictment and

charged with two counts of being a felon in possession of a firearm, in violation 18 U.S.C. §

922(g)(1); one count of possessing with the intent to distribute cocaine and fentanyl, in violation

of 21 U.S.C. § 841(a)(1); and one count of possessing a firearm in furtherance of a drug

trafficking crime, in violation of 18 U.S.C. § 924(c).  (DE 21).

On June 29, 2017, Sanders pleaded not guilty to the charges in the superseding indictment.  (DE 27).  On August 16, 2017, Sanders filed the instant motion to suppress evidence resulting from his arrest on May 2, 2017.  (DE 30).  On September 21, 2017, the Court granted a motion to withdraw filed by Attorney Marcia Linsky, who was counsel to Sanders at the time.  (DE 38; DE 40).  On September 28, 2017, Attorney Anthony Churchward filed a notice of appearance of counsel on behalf of Sanders.  (DE 44).  On October 25, 2017, Sanders filed a supplemental motion to suppress evidence found during an encounter with law enforcement on March 21, 2017.  (DE 47).  Both matters were referred to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1).  (DE 31; DE 49).

An evidentiary hearing on this matter was held on November 6 and 14, 2017.  (DE 51-52).  On January 22, 2018, Attorney Churchward filed a motion to withdraw as counsel to Sanders, and notified that Court that Sanders wished to proceed *pro se*.  (DE 60).  On February 20, 2018, District Court Chief Judge Springmann granted Attorney Churchward's motion to withdraw, allowing Sanders to proceed *pro se* with Attorney Churchward as stand-by counsel.  (DE 65).  On March 3, 2018, Sanders filed a post-hearing brief in support of his motions to suppress.  (DE 67).  Sanders filed what the Court construed as a supplemental brief on March 19, 2018.[1]  (*See* DE 69-72).  The Government filed its response on April 23, 2018.  (DE 83).  On May 11, 2018, Sanders filed his reply brief.  (DE 84).

## II.  FINDINGS OF FACT

At the evidentiary hearing, the Government offered the testimony of Fort Wayne Police

---

[1] Sanders filed various other motions requesting subpoenas and other relief related to his motion to suppress (*see, e.g.*, DE 70; DE 73-75; DE 77), which the Court has previously ruled on and will not be discussed in this Report and Recommendation.

Department ("FWPD") Officer Geoffrey Norton ("Officer Norton"); United States Marshal Service Deputy John Simpson ("Deputy Simpson"); United States Marshal Service Deputy Eric Anderson ("Deputy Anderson"); Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Task Force Officer Caleb Anderson ("TFO Anderson"); and ATF Special Agent Timothy Worthen ("Special Agent Worthen). (DE 58; DE 59, Transcript of Motion to Suppress Hearing ("Tr.") 2, 140). Sanders offered the testimony Ms. Angelia Freeman ("Freeman") and himself. (Tr. 140).

Exhibits of record confirm and corroborate evidence offered by the Government's witnesses, and the Government's witnesses provided consistent descriptions of the events in this case. However Sanders and Freeman contradicted themselves, each other, and exhibits of record. Therefore, as discussed below, I FIND the Government's witnesses to be credible, and Sanders and Freeman not to be credible.

### A. The March 21, 2017, Encounter

Around 3:18 p.m. on March 21, 2017, Officer Norton[2] was on patrol in his police vehicle,[3] driving eastbound on McKinnie Avenue, when he passed a silver Hyundai traveling in the opposite direction. (Tr. 8-9). Officer Norton testified that the driver of the silver Hyundai, later identified as Sanders (Tr. 12-13), gave a look with widened eyes, which drew Officer Norton's attention (Tr. 9-10, 23-24). Officer Norton testified that in his experience, Sanders's look indicated possible criminal activity.[4] (Tr. 10, 31).

---

[2] Officer Norton has been a patrolman for the FWPD for three years, and has graduated from the 20-week long academy. (Tr. 6). Officer Norton worked a 90-day temporary assignment with the gang unit, and has six years of previous experience as a military policeman in the army reserves. (Tr. 6-7).

[3] On March 21, 2017, Officer Norton was wearing his full police uniform and driving a fully marked police vehicle. (Tr. 8).

[4] Sanders testified that Officer Norton could not have seen him because he has tinted windows. (Tr. 253-54).

Officer Norton decided to turn around and follow Sanders to see if he committed any traffic violations or exhibited other signs of criminal activity. (Tr. 10, 27; Ex. 1 at 0:01-0:10[5]). After Officer Norton turned his vehicle around, Sanders accelerated away from him at a high rate of speed, approximately 55 to 60 miles per hour, and turned onto Smith Street. (Tr. 10, 26-28). Officer Norton perceived that Sanders was trying to flee. (Tr. 29). Officer Norton testified that the speed limit was 30 miles per hour in that area. (Tr. 10). As Officer Norton got closer to Sanders, he observed Sanders fail to turn on his turn signal within 200 feet of a turn onto Rudisill Boulevard, and fail to come to a complete stop at a stop sign.[6] (Tr. 11, 22, 28; Ex. 1 at 0:32-0:49). Sanders proceeded to turn onto Rudisill Boulevard, followed by Officer Norton, and Sanders then turned onto Bowser Avenue. (Tr. 11). Once Officer Norton turned onto Bowser Avenue he activated his emergency lights and called out that he was making a stop. (Tr. 11).

Sanders continued to accelerate, prompting Officer Norton to turn on his emergency sirens.[7] (Tr. 11, 22-23, 29, 263; Ex. 1 at 0:58-1:20). However, Sanders continued to flee Officer Norton, reaching speeds of 65 or 70 miles per hour. (Tr. 11-12). After Sanders made a few more turns, he stopped his car in an alley behind a house, got out, and attempted to flee on foot. (Tr. 12).

Officer Norton exited his vehicle and ran after Sanders commanding him to stop. (Tr. 12-13). Once Officer Norton caught up with Sanders, a struggle ensued as Officer Norton tried

---

[5] Exhibit 1 was admitted without any objection. (Tr. 18).

[6] Sanders testified that he did come to a complete stop and signal more than 200 feet from the stop sign. (Tr. 254-55). However, Officer Norton's video from that day does not support Sanders's assertion (*see* Ex. 1 at 0:32-0:49), and Sanders admitted on cross examination that he may not have signaled a turn 200 feet prior to turning (Tr. 163-64). Therefore, I FIND that Sanders is not credible as to whether he committed a traffic violation.

[7] In his testimony, Sanders admitted that he did not stop after seeing Officer Norton's police vehicle following him with emergency lights activated, knowing that Officer Norton intended to pull him over. (Tr. 255-56, 260-63).

to put Sanders in a prone position. (Tr. 13-14). Officer Norton testified that while Sanders was on his hands and knees, he reached for his waistband, which Officer Norton testified indicated that Sanders was reaching for a weapon. (Tr. 13-14). Then Officer Norton stopped trying to prone Sanders out and stepped back. (Tr. 13-14). Officer Norton brandished a taser, told Sanders not to move, and maintained some distance from Sanders until backup arrived. (Tr. 14-15). During this altercation, Officer Norton sustained a cut on his right cheek. (Tr. 20; Ex. 5).

When backup arrived, other FWPD officers handcuffed Sanders. (Tr. 15). FWPD Officer Dameron also searched Sanders after he was taken to his car, and found a small bag of marijuana and a "substantial amount of cash." (Tr. 16). Additionally, FWPD officers recovered a loaded Glock nine-millimeter pistol near the entrance to the property that was surrounded by the fence. (Tr. 15-17, 20-21; Ex. 3). The pistol had two different serial numbers (Ex. 4), which TFO Anderson[8] testified indicated that the pistol had been illegally modified (Tr. 110). Sanders admitted in his testimony that he grabbed the gun prior to exiting his vehicle. (Tr. 261-62).

Later, Officer Norton learned that Sanders's driver license was suspended. (Tr. 17). After running Sanders's information, Officer Norton believed that he had probable cause to arrest Sanders for felony resisting arrest by fleeing in his vehicle, resisting arrest resulting in an injury, and driving with a suspended license. (Tr. 31).

Shortly after Officer Norton's encounter with Sanders, he contacted TFO Anderson to alert him that Sanders had felony convictions and was in possession of a firearm, and TFO

---

[8] TFO Anderson has been employed by the Indiana State Police for ten and a half years (he has been a detective trooper for the Indiana State Police for the past year and a half), and has been assigned to the ATF as a task force officer for a year and a half. (Tr. 96-97). For most of his career with the Indiana State Police, TFO Anderson has worked calls involving stolen vehicles, narcotics, firearms, and working with investigators in Fort Wayne. (Tr. 97). TFO Anderson underwent five months of training with the ATF regarding criminal law, traffic law, civil rights, Fourth Amendment issues, narcotics, defensive and arresting tactics, and undercover investigations. (Tr. 98). Through his training and experience, TFO Anderson is also familiar with the scent of marijuana. (Tr. 98).

Anderson decided to interview Sanders.  (Tr. 98-101).  TFO Anderson testified that during the interview Sanders initially represented to TFO Anderson that the pistol FWPD found was Freeman's (Tr. 101), but eventually Sanders admitted to possessing the pistol and purchasing ammunition (Tr. 151).  TFO Anderson testified that Sanders had a tattoo indicating that he was affiliated with a gang called GMB.  (Tr. 104, 107).

While Sanders was incarcerated at the Allen County Jail, he made a couple of phone calls.  (Tr. 101-02).  TFO Anderson testified that in those phone calls, Sanders indicated that he had gotten rid of the pistol before he was arrested.  (Tr. 101-02).  TFO Anderson testified that during one phone call, Sanders urged a female to get money from a safe and post bond for him, and indicated that he had sold narcotics just before Officer Norton arrested him.  (Tr. 106-07).  Based on this phone call, TFO Anderson believed that Sanders was dealing narcotics.  (Tr. 170-71).

Following the March 21, 2017, encounter with FWPD, Sanders was indicted for being a felon in possession of a firearm.  (Tr. 99-100; DE 1).  As Sanders was released from the Allen County Jail on bond before the Government could arrest him pursuant to the indictment, TFO Anderson tried to locate him.  (Tr. 100).  TFO Anderson, via social media, learned that Sanders stayed at Freeman's house on Buell Drive.  (Tr. 100, 102).  TFO Anderson also learned that Freeman had purchased the firearms at issue in this case.  (Tr. 101).

### B.  The May 2, 2017, Encounter

On May 2, 2017, at around 9:15 a.m., TFO Anderson conducted surveillance on Freeman's house, and saw the silver Hyundai that Sanders had been driving on March 21, 2017, parked at the house. (Tr. 102-03).  On March 21, 2017, the Hyundai had a permanent license plate registered to Sanders at Freeman's address, but on May 2, 2017, TFO Anderson observed

that the Hyundai was outfitted with a temporary license plate.  (Tr. 102-03).  TFO Anderson then received permission from the ATF Resident Agent in Charge in Fort Wayne to apprehend Sanders.  (Tr. 104).

Later that morning, the United States Marshal Service Deputies and ATF agents (collectively, the "Agents") participated in a briefing regarding Sanders.  (Tr. 38).  The Agents had a warrant for Sanders's arrest for being a felon in possession of a firearm.  (Tr. 38, 68, 76). TFO Anderson presented a picture of Sanders at the briefing, and gave the Agents an account of his criminal history (*e.g.*, a conviction for dealing cocaine, felony domestic battery, battery with a weapon, and the encounter with Officer Norton).  (Tr. 41, 104-06).  Based on Sanders's tattoos, TFO Anderson informed the Agents that Sanders was likely affiliated with a gang in the area. (Tr. 104, 107, 111-12).  TFO Anderson also informed the Agents that Sanders had attempted to brandish his pistol in the altercation with Officer Norton.  (Tr. 104-05).  The Agents learned at the briefing that he was known to resist law enforcement and carry firearms.  (Tr. 38, 68, 76). The Agents learned that Sanders had a girlfriend in the house, and that children might also be present.  (Tr. 55).  Based on this briefing, the Agents felt the need to exercise more caution than usual.  (Tr. 38).  Additionally, Deputy Simpson[9] and TFO Anderson testified that in their experience, drug dealers, which Sanders was suspected of being, usually carry firearms and work with others who were also armed.  (Tr. 46-48, 108-09).

The Agents (there were around seven Agents total (Tr. 57-58, 84)) arrived at the residence on Buell Drive between 11:00 a.m. and noon on May 2, 2017, and exited their

---

[9] Deputy Simpson has been employed with the United States Marshal Service for 23 years.  (Tr. 35).  His experience includes fugitive apprehension, 16 weeks of training on defensive tactics, arrest techniques, the appearance and scent of marijuana, crack cocaine, and other illicit drugs.  (Tr. 35-37).

vehicles.[10]  (Tr. 39, 55).  All of the Agents were armed, and some of them carried rifles.  (Tr. 165-66).  Deputy Anderson[11] carried a ballistics shield, Deputy Simpson provided cover, and the other Agents were stacked behind them.  (Tr. 39, 68).  TFO Anderson and Special Agent Worthen[12] were standing to the side of the house, watching an adjacent alleyway and the back door.  (Tr. 114).

At the door, the Agents knocked and announced "U.S. Marshals, police, open the door." (Tr. 40).  An unaccompanied adult female, later identified as Freeman, opened the door.[13]  (Tr. 40, 68, 182).  Deputies Simpson and Anderson testified that once the door was open, while the Agents were still outside the house, they could smell burnt and raw marijuana emanating from the house.  (Tr. 40-42, 56-57, 69-70; *see also* Tr. 115, 185).  Deputy Simpson asked Freeman where Sanders was, and she responded that he was in the house.  (Tr. 40).  The Agents told Freeman to step outside and stay at the threshold of the door, and they walked into the house. (Tr. 41).   The Agents did not know whether other individuals besides children were in the house (Tr. 60, 73), but based on their training, they treated the situation as if there was other persons in the house (Tr. 86).  Additionally, Deputy Anderson testified that the presence of children created

---

[10] All of the Agents were dressed in law enforcement vests identifying them as ATF, police, or United States Marshal Service.  (Tr. 58).

[11] Deputy Anderson has been employed with the United States Marshal Service for over 14 years.  (Tr. 65). Prior to working for the United States Marshal Service, Deputy Anderson worked as a patrolman in Michigan for three years.  (Tr. 66).  Deputy Anderson has been trained on how to arrest fugitives and other individuals, and has experience and training on the smell of raw and burnt marijuana.  (Tr. 66-67, 70).  While working for the United States Marshal Service, Deputy Anderson has also had experience with task forces that conduct investigations into drug cartels, which sometimes involve high-threat arrests.  (Tr. 67-68).

[12] Special Agent Worthen has been with the ATF for approximately two years.  (Tr. 180).  He has 15 years of prior law enforcement experience including working for the Secret Service, Federal Air Marshal Service, some military experience, and as a patrolman in Kentucky.  (Tr. 180).  From his experience, he has become familiar with the smell and appearance of marijuana.  (Tr. 181).

[13] Freeman and Sanders contradicted each other and the Agents regarding who answered the door or who was present at the door.  (Tr. 199-202, 274; Ex.12 at 3:45-10:55).  Therefore, I FIND neither Sanders nor Freeman credible as to who met the Agents at the door.

a unique safety concern as children can be used as hostages or be put in danger.  (Tr. 73).

Once inside, Deputies Anderson and Simpson called out for Sanders to come out with his hands up.  (Tr. 42, 70-71).  After calling out for Sanders to surrender for about 45 seconds to one minute, Sanders appeared from the back of the house with his hands up and a cell phone in one of his hands.[14]  (Tr. 42, 57, 71-72).  Deputy Simpson testified that in his experience, a delay in responding to calls to surrender is a safety concern that could indicate that the individual is retrieving a weapon.  (Tr. 43).  Deputy Simpson gave repeated commands for Sanders to lay on the ground and drop the cell phone, but Sanders did not comply; rather, Sanders argued with the Agents.  (Tr. 43, 71-72, 85).  This created a stand-off situation, causing additional safety concerns because the Agents perceived Sanders was agitated and unpredictable, and because Sanders could have been planning to harm the Agents or flee.  (Tr. 44, 72-73, 85-86).

To end the standoff situation, Deputy Simpson informed Deputy Anderson that he would go "hands on" Sanders.  (Tr. 44).  Deputy Simpson holstered his pistol, approached Sanders, and put him in a prone position on the ground.  (Tr. 44, 58, 75, 89).  From their position, the Agents could not see if there was a threat around the stairs to their right or in the hallways to their left.  (Tr. 45, 70-71).  One of the Agents handcuffed Sanders (Tr. 44-45), and Deputy Simpson brandished his pistol and proceeded up the stairs to make sure that there was not a threat on the second floor (Tr. 44-45; *see* Tr. 75-76).  Deputy Anderson testified that a protective sweep in this situation is standard practice.  (Tr. 86-87, 94-95).

As Deputy Simpson went up the stairs, he noticed a large sum of money wrapped in rubber bands on the right side of the stairwell (Tr. 48-50; Ex. 10; Ex. 11), which in his

---

[14] Freeman and Sanders testified that Sanders laid down of his own accord and was not forced to do so, that he did not resist any of the Agents' orders, and that nothing was in his hands.  (Tr. 204, 207, 211-12, 269, 274-75).

experience was an indication of drug activity (Tr. 48; *see also* Tr. 115-16).  Deputy Simpson also noticed a closet on the left side of the stairwell that was closed, and a crawl space.  (Tr. 48).  Deputy Simpson testified that he opened the crawl space and the closet to find if other people who may pose a threat were hiding in the spaces but found nobody.  (Tr. 48-49).

At the same time Deputy Simpson was conducting his sweep, Deputy Anderson went into the room to the left and encountered a male child between the ages of two and four years old.  (Tr. 76-77).  Deputy Anderson kept the child company while the protective sweep was being conducted, and after the sweep were completed, he took the child outside with Freeman.  (Tr. 77).

Sanders was secured in handcuffs in the house while a second protective sweep took place.  (Tr. 50-51, 91, 186).  Deputy Anderson testified that during the second protective sweep, the Agents searched areas of the house in which they suspect a person could reasonably hide.  (Tr. 78, 80).  In the kitchen, Deputy Anderson observed a black digital scale on the stove with what appeared to be a white powder residue on it, which he believed was cocaine.  (Tr. 79, 115-16; Ex. 9).  Deputy Anderson testified that in his experience this sort of scale is indicative of drug dealing and weighing out quantities of drugs.  (Tr. 79, 83).

At that point Sanders was placed in a police vehicle and taken to the Allen County Jail.  (Tr. 120-21, 148-49).  TFO Anderson, who was wearing plain clothes, placed his weapon in his truck, and asked Freeman if she would go back inside the house and speak with him; she agreed to do so.[15]  (Tr. 118, 166).  Special Agent Worthen was also wearing plain clothes and was present during the interview.  (Tr. 167-68).  They were accompanied by ATF Agent Andy

---

[15] TFO Anderson asked Freeman if they could talk inside of the house, and Freeman agreed.  (Ex. 6-1 at 1:15-25).  Freeman contradicted this point in her testimony (Tr. 223), however, given that she is heard consenting on the recording, I FIND that her testimony is not credible on this issue.

Badowski. (Tr. 118). All of the United States Marshal Service Deputies waited outside on the porch during the interview, except for Deputy Anderson who stayed inside to accompany Freeman's child. (Tr. 167).

At the start of the interview, TFO Anderson observed that there were a number of armed law officers present; read Freeman's Miranda rights so that she would not feel intimidated, and Freeman indicated that she understood her rights. (Tr. 121, 125, 231-32; Ex. 6-1 at 3:00-4:05). Throughout this interview TFO Anderson, Special Agent Worthen, Deputy Anderson, and Freeman addressed each other in normal, polite tones. (Tr. 121, 188-89, 236-37; Ex. 6-1). The Agents did not restrain Freeman, handcuff her, touch her, prevent her from attending her child, or block any exits. (Tr. 124, 188-89).

TFO Anderson asked Freeman about the firearm found during the March 21, 2017, encounter. (Tr. 121; *see also* Ex. 6-1[16]). Freeman admitted that Sanders gave her $200 to purchase the Glock pistol, but insisted that Sanders did not access or take the pistol.[17] (Ex. 6-1 at 20:30-23:34). However, later on, Freeman admitted that Sanders had access to the pistol when he wanted. (Tr. 126-27). Freeman denied knowing that Sanders was dealing drugs and denied that she or Sanders used drugs.[18] (Tr. 129; Ex. 6-1 at 25:50-26:05; *see also* Ex. 6-2 at 14:45-

---

[16] Exhibit 6 contains two audio files of two different interviews TFO Anderson conducted with Freeman on May 2, 2017. The first takes place before the consent search, file name "17502_0073", referred to in this Report and Recommendation as "Ex. 6-1." The second takes place after the consent search, file name "170502_74", referred to as "Ex. 6-2."

[17] Freeman denied this point during her testimony, insisting that Sanders had not given her money to purchase the Glock pistol but that she provided Sanders with access to the pistol. (Tr. 229-30). To the extent that Sanders may or may not have financed the purchase is not germane; rather, it is important that he had access to the pistol.

[18] At the hearing, Freeman testified that she did not smoke marijuana at all and that Sanders did not smoke marijuana in her house. (Tr. 213, 233). However, given the consistent testimony of the Agents that a smell of marijuana was emanating from the house (Tr. ), and Freeman's statement during her interview with TFO Anderson that she had smoked marijuana (Ex. 6-2 at 13:20-15:45), I FIND that Freeman is not credible on this issue.

15:45).  Freeman also claimed that the amount of cash totaling over $3,000 near the stairs belonged to her and that she had received it as part of a tax refund.[19]  (Tr. 128-29).

TFO Anderson advised Freeman that if she lied to the Agents, she would be committing a federal felony.  (Ex. 6-1 at 8:15-8:35).  TFO Anderson, Special Agent Worthen, and Deputy Anderson all explained to Freeman that if she lied to Agents and was caught, or if law enforcement were called back to her house leading to the discovery of contraband, it would likely result in Freeman losing custody of her children to Child Protective Services.[20]  (Tr. 82-83, 127; Ex. 6-1 at 8:15-8:35, 26:15-26:45, 29:15-29:50).  The Agents also explained that if Freeman consented to a search of her house, the Agents could find and remove all contraband from the house, thereby reducing the likelihood that she would lose custody of her children.  (Ex. 6-1 at 26:15-26:45, 29:15-29:50).  Subsequently, TFO Anderson read a "Consent to Search" form to Freeman,[21] who signed the document, giving the Agents consent to search the house, the Hyundai, and the Mercedes.  (Tr. 130-31, 144; Ex. 6-1 at 31:11-34:36; *see* Ex. 7).  The Consent to Search form states that the person giving consent has "a right to refuse to give [] consent to a search and may demand that a search warrant be obtained prior to any search . . . ."  (Tr. 145; Ex. 7).  The Consent to Search form also states that the person giving consent understand that he or she may consult with an attorney before or during the search, may revoke consent during the search, and that his or her consent has been given voluntarily.  (Ex. 7).

---

[19] It is worth noting that Freeman was not employed during the entire preceding fiscal year, and that she usually only made $700 a month.  (Ex. 6-1 at 18:00-20:30).

[20] Freeman testified that the Agents threatened to take her children away if she did not consent to a search of the house.  (Tr. 233-34).  Freeman also testified that she was nervous and scared during her interviews with the Agents.  (Tr. 244-45).  However, she also acknowledged that the Agents were respectful and polite to her.  (*See* Ex. 6-2 at 5:40-15:45).

[21] Freeman testified that TFO Anderson did not read her this document.  (Tr. 232).  However, because he is heard reading the Consent to Search form on the recording from the interview, I FIND that Freeman is not credible on this point.

During the consent search, the Agents came across a safe in Freeman's bedroom that she testified belonged to her. (Tr. 171-72, 246-47). Freeman gave the Agents the information necessary to unlock the safe. (Tr. 171-72). Inside the safe, the Agents found a pistol and one of Sanders's mobile phones. (Tr. 176-77, 246-47).

Inside a closet, Deputy Simpson found a gun case with magazines and bullets in a purse. (Tr. 52). The Agents found large quantities of fentanyl, heroin, cocaine, and marijuana, the scales on the kitchen stove, and over $3,000 in United States currency. (*See* Tr. 146-48; Ex. 8). Some contraband was located in cabinets in the kitchen, next to the stove. (Tr. 146-47, 189-91, 235; Ex. 6-2 at 1:00-3:00). Regarding the firearm found during the search, Freeman claimed that she bought it for herself but that Sanders did take it sometimes. (Ex. 6-2 at 9:00-12:40).

After completing the consent search, Special Agent Worthen and TFO Anderson went to the Allen County Jail to interview Sanders. (Tr. 149-50; *see* Ex. 12). At the start of the interview, TFO Anderson read Sanders's Miranda rights. (Ex. 12 at 2:20-2:40). Sanders initially denied knowledge that the scales, narcotics, and other contraband were in the house, and denied that he was dealing drugs. (Tr. 172-73; Ex. 12 at 3:45-10:55). Because Sanders denied that the narcotics were his, Special Agent Worthen asked Sanders if he was indicating that Freeman or one of the children were making and distributing narcotics. (Tr. 173-74; Ex. 12 at 57:30-57:40).

Sanders inquired a number of times about what benefits he would receive if he gave the Government information regarding his associates and activities related to distributing and purchasing narcotics. (Tr. 155-56; *see* Ex. 12 at 39:00-43:00). Eventually, Sanders admitted to owning, purchasing, and selling the narcotics found in Freeman's house. (Tr. 157-58; Ex. 12 at 1:39:45-2:24:30). Sanders then provided Special Agent Worthen and TFO Anderson with information on two known narcotics distributors in Fort Wayne and others involved with dealing

and buying narcotics.  (Ex. 12 at 1:39:45-2:24:30).  Sanders described where the buyers and

sellers lived, manufactured, and sold narcotics; their methods or protocols in conducting sales;

what vehicles they drove; and what firearms they carried.  (Tr. 157-58; Ex. 12 at 1:39:45-

2:24:30).  Much of the information Sanders provided was independently verified.  (Tr. 177-79).

### III.  DISCUSSION

### A.  Legal Standard

"The Fourth Amendment protects citizens against unreasonable searches and seizures.

Ordinarily, warrantless searches are presumptively unreasonable."  *United States v. Richards*,

719 F.3d 746, 754 (7th Cir. 2013); *see* U.S. Const. amend. IV; *United States v. Whitaker*, 546

F.3d 902, 906 (7th Cir. 2008) ("The Fourth Amendment to the Constitution of the United States

prevents the Government from conducting unreasonable searches and seizures." (citing *United

States v. Arvizu*, 534 U.S. 266, 273 (2002))).

The Due Process Clause of the Fourteenth Amendment requires that a suspect's

incriminating confession be given voluntarily.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 225

(1973)  ("The Due Process Clause does not mandate that the police forgo all questioning, or that

they be given carte blanche to extract what they can from a suspect. . . .  Is the confession the

product of an essentially free and unconstrained choice by its maker?"); *United States v. Huerta*,

239 F.3d 865, 871 (7th Cir. 2001) ("Thus, coercive police activity is a 'necessary predicate to the

finding that a confession is not voluntary within the meaning of the Due Process Clause of the

Fourteenth Amendment.'") (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986))).

Here, the Government does not dispute that Sanders and his automobile were searched

and seized without a warrant on March 21, 2017.  The Government also does not dispute that

Freeman's house was searched without a search warrant on May 2, 2017.  This presents the

following issues with regard to potential exceptions to the Fourth Amendment's warrant requirement in this case: (1) whether Officer Norton had probable cause or reasonable suspicion to stop Sanders on March 21, 2017; (2) whether the protective sweeps of Freeman's home were lawful; (3) whether Freeman voluntarily consented to the search of the house on Buell Drive; and (4) whether Freeman had authority to consent to a search of the safe in her bedroom. Sanders also asserts that his confession was coerced after his arrest on May 2, 2017.

## B. The Traffic Stop

First, Sanders argues that Officer Norton lacked reasonable suspicion or probable cause to seize him on March 21, 2017. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996) (citations omitted). Probable cause exists when "the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense." *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000); *see also United States v. Smith*, 668 F.3d 427, 430 (7th Cir. 2012). The probable cause standard is an objective one, not a subjective one, and any ulterior motive an officer may have for making the stop is irrelevant. *See United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011) ("The officer's subjective motivations for stopping and detaining a suspect are not relevant to the reasonableness inquiry." (citing *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007); *United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998))); *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003) (citing *Whren*, 517 U.S. at 813); *United States v. Hernandez-Rivas*, 348 F.3d 595, 599 (7th Cir. 2003).

An officer does not seize a suspect during a pursuit or while the suspect ignores commands to stop; rather the suspect is not seized under the Fourth Amendment until the

"suspects submits to the officer[.]"  *United States v. Collins*, 714 F.3d 540, 543 (7th Cir. 2013) (citing *California v. Hodari D.*, 499 U.S. 621-26 (1991)); *see United States v. Mendenhall*, 446 U.S. 544, 553 (1980); *United States v. Mays*, 819 F.3d 951, 956 (7th Cir. 2016) ("'Even when somebody is confronted with an obvious show of authority, he is not seized until his freedom of movement is terminated by an application of physical force or by the suspect's submission to the asserted authority.'" (quoting *United States v. $32,400.00, in U.S. Currency*, 82 F.3d 135, 138-39 (7th Cir. 1996))).  The Seventh Circuit Court of Appeals has been clear that a suspect who gives chase to an officer in a vehicle does not submit to the officer just because the officer activates his emergency equipment.  *See Collins*, 714 F.3d at 543; *United States v. Griffin*, 652 F.3d 793, 800 (7th Cir. 2011) (holding that a seizure cannot occur until the suspect submits to the officer's show of force); *Marion v. City of Corydon, Ind.*, 559 F.3d 700, 705 (7th Cir. 2009) ("In this case, the government seizure occurred in the highway median, when law enforcement officers finally terminated Marion's freedom of movement.").

Here, Sanders asserts that Officer Norton seized Sanders when he turned around on McKinnie Avenue to follow Sanders.  However, Sanders argues that Officer Norton lacked probable cause that criminal activity was afoot at that point, and therefore, any evidence of criminal activity precipitating from the chase is inadmissible as fruit of the poisonous tree.  Indeed, Sanders has gone so far as to allege that Officer Norton's dashcam video has been tampered with such that it does not show when Officer Norton initially passed Sanders on McKinnie Avenue.  (*See, e.g.*, DE 66; DE 70).  Sanders alleges that the complete version of the dashcam video shows that his windows were heavily tinted as to prevent Officer Norton from seeing his face as they passed.  Sanders alleges, therefore, that Officer Norton stopped Sanders solely because Sanders is African-American.

What Sanders fails to appreciate is that Officer Norton did not need any level of suspicion to justify following him. Turning around and following somebody in a police vehicle does not constitute a seizure under the Fourth Amendment. *See, e.g.*, *Mays*, 819 F.3d at 956; *Collins*, 714 F.3d at 543; *Griffin*, 652 F.3d at 800. Sanders was not seized under the Fourth Amendment until he was subdued by Officer Norton's show of authority, *see Mays*, 819 F.3d at 956; *Collins*, 714 F.3d at 543, well after they ran into the fenced area behind the house in the alleyway. Sanders's arguments to the contrary are unpersuasive as he relies on cases outside of the Seventh Circuit or misconstrues the holdings of Supreme Court and Seventh Circuit case law.

Therefore, Officer Norton's credibility notwithstanding, it is of no moment whether the silver Hyundai's windows were tinted as to prevent Officer Norton from seeing Sanders's face. Moreover, Sanders's claim that he was stopped due to racial profiling is meritless. Even if Officer Norton did not see Sanders's face or otherwise fabricated his reasons for following Sanders, nothing in the record indicates that Officer Norton acted based upon racial animus. And in any event, the Supreme Court has made it clear that the "Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813; *see also Bullock*, 632 F.3d at 1012 (citations omitted).

Thus, the issue becomes whether Officer Norton observed Sanders commit any traffic violations prior to Officer Norton subduing him. As Officer Norton testified and as his dashcam video shows, Sanders did not fully stop at the stop sign at the intersection of Rudisill Boulevard and Smith Street, in violation of Ind. Code § 9-21-8-32, and Sanders did not turn on his turn

signal 200 feet prior to the turn, in violation of Ind. Code § 9-21-8-25.  Moreover, Sanders was

driving at speeds of around 55 to 65 miles per hour in a 30 miles per hour zone, in violation of

Ind. Code. § 9-30-2-2.  And if the windows on the silver Hyundai were as tinted as Sanders

claims, then, as the Government correctly points out, Officer Norton would have had additional

cause to stop Sanders.  (DE 83 at 15 (pointing out that Ind. Code § 9-19-194(c) permits law

enforcement to stop a vehicle with windows tinted to block 25% of light as measured from the

nonfilm side of the window)).  Finally, it is not disputed that Sanders failed to stop after Officer

Norton activated his emergency lights and sirens in an attempt to pull Sanders over, in violation

of Ind. Code § 35-22.1-3-1.

    Therefore, I FIND that Officer Norton had probable cause to stop Sanders on March 21,

2017.

### C.  The Protective Sweeps

    Second, Sanders argues that the Agents unlawfully conducted two protective sweeps of

Freeman's house on May 2, 2017, while arresting him.[22]  "'A protective sweep is a quick and

limited search of premises, incident to an arrest,' and can be conducted without a search warrant

if the purpose of the search is 'to protect the safety of police officers or others.'"  *United States v.

Schmitt*, 770 F.3d 524, 530 (7th Cir. 2014) (quoting *Maryland v. Buie*, 494 U.S. 325, 327

(1990)); *see United States v. Burrows*, 48 F.3d 1011, 1015 (7th Cir. 1995).  "It is narrowly

confined to a cursory visual inspection of those places in which a person might be hiding."  *Buie*,

494 at 327; *see Burrows*, 48 F.3d at 1015.  The Supreme Court provided the following guidance

---

[22] Sanders appears to argue that the Agents were required to obtain consent to enter Freeman's house, which he alleges she did not give.  Sanders fails to understand that he was arrested pursuant to a warrant, and that therefore, Freeman's consent was not necessary to apprehend him.  *See Payton v. New York*, 445 U.S. 573, 603 (1980) ("Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."); *United States v. Jackson*, 576 F.3d 465, 468 (7th Cir. 2009).

for when a protective sweep may take place:

> [T]he Fourth Amendment would permit the protective sweep undertaken here if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others.

*Buie*, 494 at 327; *see Schmitt*, 770 F.3d at 531; *Burrows*, 48 F.3d at 1015.

It is well established "that '[t]he inquiry is an exceptionally fact-intensive one in which we must analyze myriad factors including, among other consideration, the configuration of the dwelling, the general surroundings, and the opportunities for ambush.'" *United States v. Henderson*, 748 F.3d 788, 791 (7th Cir. 2014) (alteration in original) (quoting *United States v. Starnes*, 741 F.3d 804, 808 (7th Cir. 2013)). "An ambush in a confined setting of unknown configuration is just such a situation in which an officer might need to perform a protective sweep." *Starnes*, 741 F.3d at 808 (citations omitted).

Sanders argues that the protective sweeps of Freeman's house were unreasonable because: (1) the Agents had no reason to believe that others were present in the house who could pose a threat; (2) Sanders was arrested at the front door without resisting; and (3) there were no exigent circumstances necessitating a protective sweep. All of his arguments fail.

Contrary to Sanders's first argument, the Agents did not need to observe anyone else in the house or be told that anyone else was in the house to justify a protective sweep. *See United States v. Thompson*, 842 F.3d 1002, 1009 (7th Cir. 2016) ("As the door was opening, Agent Reynolds asked Thompson whether anyone was inside and received no response."). Law enforcement are permitted to draw on their experience, using common sense to make reasonable inferences based on what they know. *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (finding that law enforcement may develop reasonable suspicion based on "'specific and

articulable facts which, taken together with rational inferences from those facts,' suggest criminal activity" (quoting *Terry*, 392 U.S. at 21-22)); *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006) ("In determining whether suspicious circumstances rise to the level of probable cause, officers are entitled to draw reasonable inferences based on their training and experience.").

Here, the Agents were briefed on Sanders's criminal history prior to executing the warrant for his arrest including, Sanders's phone calls from prison indicating that he was dealing narcotics; Sanders's conviction for dealing cocaine; that Sanders resisted law enforcement resulting in an injury to a police officer on March 21, 2017; that Sanders was likely armed; and that Sanders was affiliated with a gang in the area. Further, Deputy Simpson, Deputy Anderson, and TFO Anderson testified that, based on their experience, drug dealers usually have armed associates with them in a house and that special caution was warranted in this situation. These factors, considered in totality, provided the Agents with the reasonable belief that other persons could be in Freeman's house as to justify the protective sweeps.[23] *Henderson*, 748 F.3d at 791; *Starnes*, 741 F.3d at 808.

Similarly, Sanders's argument that the sweeps were not necessary because he was arrested at the front door without resisting is unpersuasive. As observed, *supra*, Sanders and Freeman lack credibility regarding the circumstances of the Agents entering Freeman's house

---

[23] To the extent that Sanders argues that a secondary sweep was unreasonable because it was duplicative of the first protective sweep, his argument fails. The only new evidence discovered during a secondary sweep was the scale in the kitchen. It is not disputed that this scale was in plain view, or that somebody could have been hiding in the kitchen. *See Buie*, 494 at 327; *Burrows*, 48 F.3d at 1015. Moreover, Deputies Simpson and Anderson testified that secondary sweeps are standard practice and necessary to ensure officer safety. *Schmitt*, 770 F.3d at 530. Even if the secondary sweep was unreasonable under the Fourth Amendment, the scale in the kitchen would have been discovered pursuant to the consent search. *See United States v. Cartwright*, 630 F.3d 610, 613 (7th Cir. 2010) ("Under the inevitable discovery doctrine, if the government can establish that the evidence at issue, even though unlawfully obtained, would have inevitably been discovered through lawful means, then the deterrence rationale animating the exclusionary rule has so little basis that the evidence should be admitted." (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)).

and apprehending Sanders.  Moreover, Sanders's location in the house and his level of cooperation are not determinative on whether the protective sweeps were reasonable under the Fourth Amendment.  *See Buie*, 494 U.S. at 328 (finding a sweep of the basement reasonable after the suspect had exited the basement and was apprehended); *Henderson*, 748 F.3d at 792-93 (finding a protective sweep reasonable where the defendant exited the house 10 minutes prior to the sweep).

Finally, Sanders argues that the protective sweeps were not justified absent exigent circumstances to search Freeman's house.  Sanders is incorrect.  "Exigent circumstances" is an exception to the Fourth Amendment's warrant requirement, distinct and separate from the "protective sweep" exception.  *See United States v. Rivera*, 825 F.2d 152, 156 (7th Cir. 1987) ("One such exception is the exigent circumstances doctrine which recognizes that warrantless entry by criminal law enforcement officials may be legal when there is a compelling need for official action and no time to secure a warrant." (citation and internal quotation marks omitted)).  Thus, the lack of exigent circumstances in this case has no effect on the validity of the Agents' protective sweeps under the Fourth Amendment.

Therefore, I FIND that the protective sweeps of Freeman's house were reasonable under the Fourth Amendment.

### D.  Freeman's Consent

Third, Sanders argues that Freeman did not voluntarily consent to the search of her house.  Law enforcement may search property or a container without a warrant if they obtain voluntary consent either from the individual whose property is to be searched or from a third party possessing common control or authority over the property.  *United Sates v. Rosario*, 962 F.2d 733, 737 (7th Cir. 1992) (citing *United States v. Matlock*, 415 U.S. 164 (1974); *Schneckloth*, 412

U.S. at 248). "When the government seeks to rely on consent to justify a warrantless entry or

search, it must prove by a preponderance of the evidence that 'the consent was in fact voluntarily

given, and not the result of duress or coercion, express or implied.'" *United States v. Conrad*,

578 F. Supp. 2d 1016, 1038 (N.D. Ill. 2008), *aff'd*, 673 F.3d 728 (7th Cir. 2012) (quoting

*Schneckloth*, 412 U.S. at 248; *United States v. Dickerson*, 975 F.2d 1245, 1249 (7th Cir. 1992)).

To evaluate voluntariness, courts evaluate the situation under the totality of the circumstances.

*United States v. Biggs*, 491 F.3d 616, 622 (7th Cir. 2007) (citation omitted). In particular, courts

consider the following criteria:

> (1) the age, education and intelligence of the [consenting party];
> (2) whether [the consenting party] was advised of [her]
> constitutional rights; (3) the length of detention prior to consent;
> (4) whether [the consenting party] consented immediately or police
> made repeated requests for consent; (5) whether physical coercion
> was used; (6) whether [the consenting party] was in custody.

*Id*. (citation and internal quotation marks omitted).

Sanders's argument that Freeman was coerced is largely based on his version of the facts.

Freeman testified that she was scared and that the Agents threatened to take her children away if

she did not consent to the search. However, her tone and attitude during the interview were calm

and collected, and she admitted that the Agents were polite and respectful to her. *See United*

*States v. Pedroza*, 269 F.3d 821, 826 (7th Cir. 2001) ("Taken together with his conduct

immediately following the verbal exchange, any ambiguity disappears, and it becomes clear that

Juan was agreeing to have a conversation with the agents."). Freeman was not restrained or

physically touched, and TFO Anderson read her Miranda rights specifically so that she would

not feel intimidated by the Agents' presence and read her the Consent to Search form, which

apprised her of her rights under the Fourth Amendment and to consult an attorney. *See Biggs*,

491 F.3d at 622 ("The officers advised Biggs of his constitutional rights with Miranda

warnings."). Moreover, TFO Anderson and Freeman talked for only a short time, about 30 minutes, prior to her giving consent. *See United States v. Thompson*, 842 F.3d 1002, 1010 (7th Cir. 2016) ("By Thompson's own estimation, the entire ordeal lasted approximately 30 minutes."); *United States v. Strache*, 202 F.3d 980, 986 (7th Cir. 2000) (finding twenty minutes to be a reasonable amount of time); *see also Pedroza*, 269 F.3d at 829.

Furthermore, while the Agents did apprise Freeman of the risk that she could lose custody of her children if she was caught with contraband, they did not threaten that they or anyone else were certain to take her children if she refused to consent. *Cf. United States v. Bolin*, 514 F.2d 554, 560 (7th Cir. 1975) ("[T]here is no question that it was in fact an implied threat that if the consent were not signed the woman would be arrested."). And while the risk of losing custody of her children may have caused Freeman stress or concern, she did not exhibit the sort of duress that would invalidate her consent. *See Biggs*, 491 F.3d at 623 (finding that statements leading to a belief that the defendant would be released did not amount to threats or promises). In short, Freeman's "behavior would clearly indicate to a reasonable observer that [she] sufficiently understood the consequences of her consent." *United States v. Grap*, 403 F.3d 439, 444 (7th Cir. 2005).

Therefore, I FIND that Freeman voluntarily gave the Agents consent to search her house, the Hyundai, and the Mercedes.[24]

### E. Freeman's Authority to Authorize a Search of the Safe

Fourth, Sanders argues that Freeman could not give valid consent to the Agents to search

---

[24] Even if Freeman did not voluntarily consent to the search, Sanders does not deny that based on what the Agents found in plain sight, and the scent of marijuana emanating from the house, that the Agents had probable cause for a search warrant. Thus, the contraband found during the consent search, even if it was unlawfully obtained, which it was not, would inevitably have been found during the execution of a search warrant. *See Cartwright*, 630 F.3d at 613 (citing *Nix*, 467 U.S. at 444).

the safe in her bedroom because it did not belong to her and because she did not have access to it.  "The consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared."  *Matlock*, 415 U.S. at 170; *see United States v. Sharp*, No. 11-CR-197, 2013 WL 4522929, at *7 (E.D. Wis. Aug. 27, 2013).  Common authority turns on "mutual use of the property by persons generally having joint access or control for most purposes."  *Sharp*, 2013 WL 4522929, at *7 (citation and internal quotation marks omitted).  "With respect to locking mechanisms, courts also consider whether the defendant provided the third party with a combination or key to the lock."  *United States v. Basinski*, 226 F.3d 829, 835 (7th Cir. 2000) (citing *United States v. Presler*, 610 F.2d 1206, 1214 (4th Cir. 1979)); *see United States v. Wright*, 838 F.3d 880, 887 (7th Cir. 2016) ("Typically this analysis entails considering the nature of the container and its outward appearance, including the presence of any sort of locking mechanism." (citation omitted)).

Here, Sanders's argument that Freeman did not own and could not open the safe is meritless.  Freeman testified that the safe was hers (Tr. 246), and TFO Anderson gave uncontested testimony that Freeman was sufficiently familiar with the safe as to provide the Agents with the necessary information to open it (Tr. 171-72).  Additionally, the safe contained a gun that Freeman claimed to use.  (Tr. 176-77, 246-47).  Freeman demonstrated mutual use and the right of access to the locked safe, such that she could authorize the Agents to open and search it, even if Sanders did not consent.  *See Basinski*, 226 F.3d at 835 (emphasizing that knowledge of a lock's combination demonstrates access to the container's contents); *Presler*, 601 F.2d at 1214-15 (giving the key or combination to a lock to a third party suggests that they have "general access").

Therefore, I FIND that Freeman's consent to search the safe was valid.[25]

### F. Sanders's Confession

Fifth, Sanders argues that his confession following his arrest was not voluntary because TFO Anderson and Special Agent Worthen threatened his family if he did not confess. "An incriminating statement is voluntary if it is 'the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009) (quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)). "Trickery, deceit, even impersonation do not render a confession inadmissible . . . unless government agents make threats or promises." *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2011) (citations omitted). Whether the confession was voluntarily given is viewed under the totality of the circumstances, including whether the defendant was read his *Miranda* rights, his age, the duration and nature of the questioning, and whether the defendant was physically punished. *Vaillalpando*, 588 F.3d at 1128 (citing *United States v. Charles.* 476 F.3d 492, 497 (7th Cir. 2007)). "The issue of coercion is determined from the perspective of a reasonable person in the position of the suspect." *United States v. Brooks*, 125 F.3d 484, 492 (7th Cir. 1997) (citation and internal quotation marks omitted). The Government bears the burden of proving the voluntariness of the confession. *Vaillalpando*, 588 F.3d at 1128 (citations omitted).

Here, after Sanders's repeated denials that he knew anything about the contraband found at Freeman's house, TFO Anderson and Special Agent Worthen asked Sanders whether he was

---

[25] Even if Freeman did not have access to the safe as to validly consent to a search, any contraband in the safe would have been found during the execution of a warrant, which the Agents would have likely obtained because they had probable cause that they would find evidence of criminal activity at Freeman's house. Therefore, Sanders has not demonstrated grounds to suppress contraband found in the safe. *See Cartwright*, 630 F.3d at 613 (citing *Nix*, 467 U.S. at 444).

indicating that Freeman was dealing narcotics.  The Agents also indicated to Sanders that Freeman was in trouble for her part in purchasing pistols for Sanders.

The Seventh Circuit has found that a promise to release a mother "from custody if [the defendant] confesses does not make his statement involuntary; if the police have good ground for holding the mother, the information adds to the options at the suspect's disposal."  *United States v. Miller*, 450 F.3d 270, 272 (7th Cir. 2006), abrogated on other grounds by *Kimbrough v. United States*, 552 U.S. 85 (2007) (collecting cases).  Similarly, in *United States v. Westbrook*, 125 F.3d 996, 1006 (7th Cir. 1997), the court found that the defendant was able to rationally decide to confess even though law enforcement told him that his confession would help his wife who was accused of drug possession.  Indeed, law enforcement "are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible."  *Id*. at 1005-06 (citation and internal quotation marks omitted).  And while the Seventh Circuit has expressed disapproval when law enforcement bring up a suspect's family to elicit a confession, such remarks fall short of coercion.  *See United States v. Lee*, 618 F.3d 667, 677 (7th Cir. 2010) (agreeing with the district court that the defendant was not coerced by law enforcement's references that the defendant "had a lot at stake" and three young children to think about).

Here, to the extent the Agents told Sanders that Freeman could be charged for her role in purchasing pistols for him or for drug trafficking, such statements fall short of coercion.  The Agents did not communicate "[a]n objectively unwarranted threat to arrest or hold [Freeman] . . . without probable cause" as to warrant suppressing Sanders's confession.  *Miller*, 450 F.3d at 272 (citing *Lynumn v. Illinois*, 372 U.S. 528 (1963)).  Neither does Sanders "deny that the

Constitution would have allowed" the Agents to arrest Freeman, as they likely had probable cause to do so. *Id.* at 273.

In fact, the Agents read Sanders his *Miranda* rights, they did not use physical force, they explained that he could choose not to provide information, they did not make any promises, and they even attempted to end the interview when Sanders did not seem cooperative but Sanders asked them to stay. *See Lee*, 618 F.3d at 676 (finding a confession voluntary when under the circumstances it is the product of rational and free will and not the result of physical abuse, psychological intimidation, or other tactics to override the defendant's free will (citations omitted)); *Kontny*, 238 F.3d at 817 ("Confessions or other admissions obtained in the course of an interrogation are deemed involuntary and therefore inadmissible only if they are procured by threats or promises." (collecting cases)).  "[N]othing in this record leads [me] to believe the agents misled [Sanders] or exploited [his] anxiety to the point that he was unable to make a rational decision about whether to confess." *Westbrook*, 125 F.3d at 1006 (citations omitted).

Therefore, considering the totality of the circumstances, I FIND that Sanders's confession was voluntary.

## IV.  CONCLUSION

For the above reasons, I CONCLUDE that Sanders's Fourth Amendment rights and his rights under the Due Process Clause of the Fourteenth Amendment were not violated as to warrant suppressing the evidence in this case.  I therefore RECOMMEND that Sanders's motion to suppress evidence (DE 30) and his supplemental motion to suppress evidence (DE 47) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties.  NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of

this recommended disposition, a party may serve and file specific, written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

Dated this 11th day of June 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge