# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| UNITED STATES OF AMERICA | |
|---|---|
| v. | CAUSE NO.: 1:17-CR-29-HAB |
| JOSEPH E. SANDERS | |

## SENTENCING OPINION

The Defendant, Joseph E. Sanders, is awaiting sentence on his conviction for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count 1s), and for possessing with intent to distribute heroin, marijuana, cocaine, and fentanyl in violation of 21 U.S.C. § 841(a)(1) (Count 2s). An officer with the United States Probation Office prepared a Presentence Investigation Report (PSR) [Second Revised Presentence Investigation Report, ECF No. 162] in anticipation of Defendant's sentencing. Defendant has objected to several of the Probation Officer's conclusions. He objects to the determination that his prior conviction for felony domestic battery qualifies as a crime of violence under United States Sentencing Guideline § 4B1.2(a). Defendant also disagrees with the drug quantity calculation, as well as the enhancements for obstruction of justice under § 3C1.2 and possession of a dangerous weapon under § 2D.1(b)(1).

This Opinion resolves the objections. A determination of the sentence in consideration of all the statutory factors, *see* 18 U.S.C. § 3553(a), will be made at the time of sentencing.

# ANALYSIS

Due process requires that sentencing determinations be based on reliable evidence, rather than speculation or unfounded allegations. *United States v. Santiago*, 495 F.3d 820, 824 (7th Cir. 2007). "Evidence will satisfy this requirement if it bears sufficient indicia of reliability to support its probable accuracy." *Id.* (internal quotation marks and punctuation omitted). The preponderance of the evidence standard applies to facts that are relevant to sentencing. *United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009); *United States v. Krieger*, 628 F.3d 857, 862 (7th Cir. 2010) (advising that sentencing factors that do not increase the defendant's sentence beyond the statutory range may be found by the court at sentencing by a preponderance of the evidence).

## A. Crime of Violence – Domestic Battery

The PSR's recommendation for career offender status is based on two Indiana convictions: a 2011 conviction for dealing in cocaine or narcotic drug, and a 2012 domestic battery conviction. The Information for the domestic battery charged that, on February 12, 2012, Defendant

> did knowingly or intentionally touch Jasmine Vasquez, who has a child in common with said defendant, in a rude, insolent, or angry manner, resulting in bodily injury to wit: physical pain and/or visible injury, in the physical presence of a child less than sixteen years of age, knowing the child was present and might be able to see or hear the offense.

(PSR ¶ 87.) The Defendant contends that his conviction for domestic battery does not qualify as a crime of violence because it does not require the use of violent physical force.

When he was convicted in 2012, the Indiana statute criminalized the following conduct:

> (a) A person who knowingly or intentionally touches an individual who:
>
>> (1) is or was a spouse of the other person
>>
>> (2) is or was living as if a spouse of the other person as provided in subsection (c); or
>>
>> (3) has a child in common with the other person;
>
> in a rude, insolent, or angry manner that results in bodily injury to the person described in subdivision (1), (2), or (3) commits domestic battery, a Class A misdemeanor.
>
> (b) However, the offense under subsection (a) is a Class D felony if the person who committed the offense:
>
>> \*\*\*
>>
>> (2) committed the offense in the physical presence of a child less than sixteen (16) years of age, knowing that the child was present and might be able to see or hear the offense.

Ind. Code § 35-42-2-1.3 (2012).

The definition of a crime of violence for purposes of Guideline § 4B1.1 is found in § 4B1.2(a). Under that provision, a crime of violence is an offense punishable by imprisonment for at least one year that "has as an element the use, attempted use, or threatening use of physical force against the person of another." U.S.S.G. § 4B1.2(a)(1). The categorical approach is the primary method for considering whether a previous conviction qualifies as a predicate crime of violence. *See Descamps v. United States*, 570 U.S. 254, 257 (2013); *United States v. Curtis*, 645 F.3d 937, 939–40 (7th Cir. 2011). The sentencing court "looks at the elements of the statute of conviction to determine if it has as an element the use, attempted use, or threatened use of physical force against the person of another." *United States v. Yang*, 799 F.3d 750, 752 (7th Cir. 2015) (quotation

3

marks omitted). Where a statute is divisible, the court looks "beyond the statutory definition to a limited number of documents to determine to which crime, with which elements, the defendant was convicted." *United States v. Enoch*, 865 F.3d 575, 580 (7th Cir. 2017) (describing the modified categorical approach).

The Supreme Court has defined "physical force" in the context of the similarly-worded definition of a "violent felony" under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(2)(B). *See Johnson v. United States*, 559 U.S. 133 (2010). In *Johnson*, the Court held that "'actua[l] and intentiona[l] touching'"—the level of force necessary to commit common-law misdemeanor battery—did not require the "degree of force" necessary to qualify as a "violent felony" under ACCA's elements clause. 559 U.S. at 138. "To reach this conclusion, the Court parsed the meaning of the phrase 'physical force.' First, it explained that the modifier 'physical' 'plainly refers to force exerted by and through concrete bodies—distinguishing physical force, from, for example, intellectual force or emotional force.'" *Stokeling v. United States*, 139 S. Ct. 544, 552 (2019) (citing *Johnson*, 559 U.S. at 138). Then, the Court considered whether the term "force" had the "specialized meaning that it bore in the common-law definition of battery." *Johnson*, 559 U.S. at 139. The Court "rejected the Government's suggestion that 'force' encompassed even the 'slightest offensive touching.'" *Stokeling*, 139 S. Ct. at 553 (quoting *Johnson*, 559 U.S. at 139). It held that "physical force" means "violent force—that is, force capable of causing physical pain or injury to another person." *Johnson*, 559 U.S. at 140. This definition "does not require any particular degree of likelihood or probability that the force used will cause physical pain or injury; only potentiality." *Stokeling,* 139 S. Ct. at 554.

4

A look at the Information—which is necessary to determine Defendant's crime of conviction—reveals that Defendant was charged with domestic battery as a Class D felony because it was committed in the presence of a child less than sixteen years old. In 2012, to commit such a felony under § 35-42-2-1.3 required a knowing and intentional touching of another person in a rude, insolent, or angry manner, and that this touching "result[] in bodily injury." Indiana's battery statute required that the touching actually result in an impairment of physical condition, i.e., physical pain or injury. Because the victim must suffer physical pain or injury, a battery conviction under the Indiana statute necessarily—and literally—requires that the defendant use a level of force that is "capable of causing physical pain or injury." *Johnson*, 559 U.S. at 140; *see also United States v. Jennings*, 860 F.3d 450, 457, 460–61 (7th Cir. 2017) (Minnesota domestic assault, as defined, required the infliction of physical pain or injury (or the threat of such harm) and thus required force "capable of causing physical pain or injury to another person"); *Douglas v. United States*, 858 F.3d 1069, 1071 (7th Cir. 2017) (Indiana battery that required "knowingly or intentionally touch[ing] another person in a rude, insolent, or angry manner" and that touch "results in serious bodily injury to any other person" was violent felony because "force that *actually* causes injury necessarily was capable of causing that injury"); *Yates v. United States*, 842 F.3d 1051 (7th Cir. 2016) (criminal statute proscribing the intentional infliction of bodily harm—defined to mean physical pain or injury, illness, or any impairment of physical condition—upon a victim "tracks what . . . *Johnson* said would suffice: force capable of causing physical pain or injury to another person").

The Court finds that Defendant's previous domestic battery conviction qualifies as a crime of violence under U.S.S.G. § 4B1.2(a) because it has as an element the use of physical force against the person of another. The Court overrules Defendant's objection to the determination that he is a career offender under the Guidelines.

**B.    Drug Quantity**

The Sentencing Guidelines instruct that a defendant's base offense level reflect the quantity of drugs for which the defendant is accountable. *See United States v. Griffin*, 194 F.3d 808, 826 (7th Cir. 1999) (citing U.S.S.G. § 2D1.1). The base offense level must take into account not just the quantity of drugs involved in the offense of conviction, but also the defendant's "acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2) (defining relevant conduct for purposes of drug offenses and other groupable offenses). Thus, sentencing courts are permitted to "consider additional quantities of drugs not specified in conviction, provided 'the unconvicted activities bore the necessary relation to the convicted offense.'" *United States v. Baines*, 777 F.3d 959, 963 (7th Cir. 2015) (quoting *United States v. Bacallao*, 149 F.3d 717, 719 (7th Cir. 1998) (internal quotation marks omitted)).

Under the Guidelines, two or more offenses are part of a common scheme or plan if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." U.S.S.G. § 1B1.3(a)(2), cmt. n.5(B)(i). Offenses that do not meet the requirements of a common scheme or plan may nonetheless qualify as part of the same course of conduct

6

if they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.* at n. 5(B)(ii). In assessing whether offenses are part of the same course of conduct, courts focus on "whether the government has demonstrated a significant 'similarity, regularity, and temporal proximity.'" *United States v. Ortiz*, 431 F.3d 1035, 1040 (7th Cir. 2005) (quoting *United States v. Acosta*, 85 F.3d 275, 281 (7th Cir. 1996)).

The PSR reports that Defendant told members of law enforcement during an interview at the jail that he bought the following drugs periodically for further distribution: an ounce of cocaine for $1,000, 9 ounces of crack for $9,000, and an ounce of heroin for $2,200. He advised that he had just re-upped from his supplier about two days ago. Defendant further explained that he often traded an ounce of heroin to another supplier for six pounds of marijuana. (PSR ¶ 26.) The probation officer concluded that the seizure of the drugs from the residence did not reflect the scale of the offense, as his comments revealed that he regularly purchased the described amounts of narcotics. However, there was no information regarding when the conduct began. "As such, this officer will use a very conservative estimate of a one-time purchase of each of the above drug amounts, 1 oz cocaine, 9 oz crack, 1 oz heroin, and 6 pounds of marijuana." (PSR ¶ 30.) The converted weight was 947.99kg of marihuana. (PSR ¶ 40.)

Defendant's position—that only the quantity of drugs recovered from the residence on May 2, 2017, should be counted—does not adequately account for all the conduct attributable to Defendant. The record supports the conclusion that the drugs seized from the house did not reflect the scale of Defendant's drug trafficking. He

7

admitted to "periodically" buying specific quantities of cocaine, crack and heroin for further distribution, and to making a good profit on the crack and heroin. (PSR ¶ 26.) He said he had just re-upped from his supplier two days prior. Defendant also explained that he often traded an ounce of heroin to another supplier for six pounds of marijuana.

This is sufficient evidence that Defendant "regularly engaged in drug sales," where regularity is defined as "repeated acts of events that take place at fixed and certain intervals or in accordance with the same consistent or periodical rule or practice." *United States v. Singleton*, 548 F.3d 589, 592 (7th Cir. 2008) (quoting *United States v. Sykes*, 7 F.3d 1331, 1337 (7th Cir. 1993) (internal quotation marks omitted)). Additionally, the evidence reveals sufficient similarity between the charged conduct and the uncharged drugs. There is significant overlap between the kinds of drugs that Defendant identified purchasing for further distribution and the drugs located in the residence. Finally, Defendant's admission that he had re-upped just two days earlier provides a strong temporal connection.

Defendant does not deny that he made the statements to law enforcement. Rather, his argument is that, to lend credibility to his statements, he exaggerated and misrepresented his own involvement in the drug trade. He maintains that the quantities located inside the residence, which were inconsistent with his claimed regular purchases, show that his statements about the quantities for which he had just re-upped were not true.

The Court is not convinced by Defendant's arguments for a lower drug quantity. Although exaggeration is always a hypothetical possibility, there is nothing in the record

to support that is what was going on here. Rather, the level of detail and the inculpatory nature of the statements suggest that they are reliable and accurate. Additionally, it is not difficult to think of factors that might have impacted the quantities of drugs located in the home, including sales conducted within the previous two days, or the existence of other stash locations. Numerous containers inside the home that did not contain drugs nevertheless contained drug residue. Additionally, not all the drug amounts recovered were inconsistent from Defendant's statements in a manner that would benefit Defendant. The heroin discovered inside the home weighed 55.36 grams, which is *more* than the quantity Defendant admitted to purchasing — one ounce. Moreover, as noted above, the probation officer used a conservative one-time purchase estimate. She also avoided the risk of double counting the drugs found in the residence by incorporating them into the relevant conduct.

The Court finds that the drug quantity stated in the PSR does not hold Defendant accountable for more drugs than he was responsible for trafficking as part of the same course of conduct as the count of conviction. The Court overrules Defendant's objection to the drug quantity calculation.

C. **Obstruction of Justice**

A two-level increase in the offense level applies pursuant to U.S.S.G. § 3C1.2 "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." "Reckless" is defined as "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk

9

constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. § 2A1.4, cmt. n. 1.

The probation officer's reasoning with respect to the enhancement is located in paragraph 28 of the PSR:

> [D]efendant did not initially stop, resulting in a high-speed vehicular pursuit through a residential area where the defendant accelerated to approximately 55 to 60 miles per hour in a 30 mile per hour zone. In addition, the defendant failed to come to a complete stop at a stop sign. The pursuit occurred at 3:18 p.m. when there are more vehicles traveling on roadways, children are commonly walking home from school/bus stops, crossing streets or playing outside, and pedestrians are more prevalent. As such, the defendant recklessly created a substantial risk of death or serious bodily injury to another person.

The Defendant urges the Court to review the in-car video of the pursuit that was offered at the Motion to Suppress hearing held on November 6, 2017. According to Defendant, the video reveals that there are no other vehicles or pedestrians that are in danger as a result of his flight.

"To obtain the adjustment the government must show that the defendant did more than merely flee; the guideline requires 'additional conduct' that creates a substantial risk of serious injury." *United States v. Lard*, 327 F.3d 551, 553 (7th Cir. 2003). High speed vehicle chases that endanger the lives of officers and innocent bystanders meet the standard. *See United States v. Woody*, 55 F.3d 1257, 1275 (7th Cir. 1995) (affirming the application of the two-level enhancement where the defendant fled from police and led officers on a high speed chase); *United States v. Velasquez*, 67 F.3d 650, 655 (7th Cir. 1995) (holding that flight at rates of speed between sixty and seventy-five miles per hour through residential neighborhoods supported an enhancement under § 3C1.2). The Court

can also consider what risk was created by the Defendant's actions with the firearm. *See, e.g.*, *United States v. Lard*, 327 F.3d 551, 553 (7th Cir. 2003) (considering whether defendant's act of discarding gun during flight amounted to reckless endangerment).

Whether Defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer in this case is a close call. However, having considered the totality of circumstances, the Court finds that the enhancement should apply. There can be no doubt that the speeds driven during the pursuit were well beyond what would be considered safe for the streets being traversed. The officer testified that he and Defendant were driving sixty-five to seventy miles per hour on Bowser Avenue. Bowser is a densely populated residential street. Vehicles were parked on both sides of the street, such that the road had essentially become one lane. In the video, an individual can be seen exiting his car onto the sidewalk right before the officer passes his location. Had anyone been exiting onto the street side or stepping into the street during the pursuit, the results would have been death or serious bodily injury. Moreover, other vehicles can be observed at the intersection where Defendant fails to make a complete stop.

Defendant was further aware that he had a loaded weapon on his person when he took flight on foot and began running through the residential area and attempted to climb a fence. He can be seen holding his waist band as runs from the car. Defendant would have been aware that his actions could cause him to drop the gun, even if he did not intentionally discard it. Indeed, the gun was found lying in the grass. An elementary school is located less than one block away.

11

Accordingly, although the entire flight was not particularly long, the risk created was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation. The Court overrules Defendant's objection.

**D.     Possession of Dangerous Weapon**

The probation officer applied a two-level enhancement under § 2D1.1(b)(1), which applies to a drug offense "if a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1). For this enhancement, defendant has a burden of persuasion if the government first shows "by a preponderance of the evidence that the defendant possessed a firearm in a place where drugs were present[.] [T]he adjustment should be applied unless it is clearly improbable that the weapon was connected with the offense." *United States v. Booker*, 115 F.3d 442, 443 (7th Cir. 1997) (quotation marks, brackets, and ellipses omitted); U.S.S.G. § 2D1.1 Application Note 11.

"Guns found in close proximity to illegal drugs are presumptively considered to have been used in connection with the drug trafficking offense." *United States v. Grimm*, 170 F.3d 760, 767 (7th Cir. 1999) (citing *United States v. Adams*, 125 F.3d 586, 597 (7th Cir. 1997)); *see also United States v. Corral*, 324 F.3d 866, 873 (7th Cir. 2003) (citing the Seventh Circuit's position that "guns found in close proximity to drug activity are presumptively connected to that activity"); *United States v. Johnson*, 227 F.3d 807, 814 (7th Cir. 2000) (The "proximity of a weapon to drug proceeds provides a sufficient nexus to conclude that it was not clearly improbable that the gun was connected with the offense.") (internal quotations omitted)).

Defendant argues that the loaded Smith and Wesson pistol was found in the kitchen, while the drugs were located in an upstairs bedroom. Defendant does not address the fact that cocaine and heroin cutting products were located in same kitchen cabinet as the firearm. Additionally, other indicators of drug trafficking were located nearby, including scales with drug residue and containers with marijuana residue. In light of these facts, it is not dispositive that the drugs were upstairs.

Defendant also argues that the gun belonged to Ms. Angelia Freeman, who resided at the residence, and that simple access to the firearm should not be considered a basis for application of the enhancement. Rather, for Defendant to have possessed the weapon, he must have exercised control over it. The Court finds that Defendant had control over the weapon, regardless of who purchased it. Ms. Freeman told agents that Defendant had instructed her only to use certain kitchen cabinets, and that he used the cabinet containing the cutting agents and baggies (PSR ¶ 24), the same cabinet where the gun was located. She also admitted that Defendant took her guns with him several days a week. "'An enhancement under § 2D1.1(b)(1) is appropriate for simple, and entirely passive, possession' of a firearm." *United States v. Johnson*, 227 F.3d 807, 814 (7th Cir. 2000) (quoting *Booker*, 115 F.3d at 443 (brackets omitted).

A sufficient nexus exists between the drug trafficking offense and the gun. The Court overrules Defendant's objection.

## CONCLUSION

For the reasons stated above, the Court OVERRULES Defendant's objections to the PSR. Sentencing is CONFIRMED for Wednesday, December 11, 2019, at 1:30 PM.

SO ORDERED on December 3, 2019.

                                       s/ *Holly A. Brady*
                                       JUDGE HOLLY A. BRADY
                                       UNITED STATES DISTRICT COURT